1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT

9

SOUTHERN DISTRICT OF CALIFORNIA

10

11  CHRISTINA LEE CASTLE                      Civil No.   13-cv-270 - LAB (BGS)

12                             Plaintiff,     **REPORT AND RECOMMENDATION: 1)**
                                              **TO DENY PLAINTIFF'S MOTION FOR**
13              v.                            **SUMMARY JUDGMENT; (2) TO GRANT**
                                              **DEFENDANT'S CROSS-MOTION FOR**
14  MICHAEL J. ASTRUE                         **SUMMARY JUDGMENT.**

15                             Defendant.     **[ECF. NOS. 15 and 17.]**

16

17                              **I. INTRODUCTION**

18         On February 4, 2013, Christina L. Castle ("Plaintiff") filed a complaint pursuant to the Social

19  Security Act ("Act"), 42 U.S.C. § 405(g), challenging the Commissioner of the Social Security

20  Administration's ("Commissioner") denial of disability benefits. (Doc. No. 1) On May 7, 2013,

21  Commissioner filed an answer. (Doc. No. 11) On July 9, 2013, Plaintiff filed a motion for summary

22  judgment, requesting reversal and remand of the Administrative Law Judge's ("ALJ") final decision.

23  (Doc. No. 15) Specifically, Plaintiff seeks reversal and remand of the ALJ's denial on the following

24  grounds: (1) the ALJ committed legal error by finding Plaintiff's low IQ scores between 60 and 70

25  invalid; (2) the ALJ committed legal error by finding that Plaintiff did not meet listing § 12.05C despite

26  her learning disorder, which could be considered an additional impairment; and (3) The ALJ's

27  determination of Plaintiff's Residual Functional Capacity ("RFC") is not supported by substantial

28  evidence. (Doc. No.15-1)

On September 9, 2013, the Commissioner filed a cross-motion for summary judgment and a response in opposition to Plaintiff's motion. (Doc. No. 17 and 18)  The Commissioner argues that the ALJ's decision was supported by substantial evidence; was free of legal error and should therefore be affirmed. (Doc. No. 17.)

Pursuant to Civ. L.R. 7.1(d)(1), the Court finds the parties' cross-motions are suitable for decision on the papers and without oral argument. After careful consideration of the administrative record and the applicable law, the Court **RECOMMENDS** that Plaintiff's motion for summary judgment be **DENIED** and that Defendant's cross-motion for summary judgment be **GRANTED.**

## II. LEGAL STANDARDS FOR DETERMINATION OF DISABILITY

In order to qualify for disability benefits, an applicant must show that: (1) he or she suffers from a medically determinable physical or mental impairment that can be expected to result in death, or that has lasted or can be expected to last for a continuous period of not less than twelve months; and (2) the impairment renders the applicant incapable of performing the work that he or she previously performed or any other substantially gainful employment that exists in the national economy. *See* 42 U.S.C. §423(d)(1)(A), (2)(A). An applicant must meet both requirements to be "disabled." *Id.* The applicant has the burden to establish disability. *Terry v. Sullivan*, 903 F.2d 1273, 1275 (9th Cir. 1990).

The Secretary of the Social Security Administration set forth a five-step sequential evaluation process for determining whether a person has established his or her eligibility for disability benefits. *See* 20 C.F.R. §§ 404.1520, 416.920.  The five steps in the process are as follows:

1. Is the claimant presently working in a substantially gainful activity? If so, then the claimant is not disabled within the meaning of the Social Security Act. If not, proceed to step two.  *See* 20 C.F.R. §§ 404.1520(b), 416.920(b).

2. Is the claimant's impairment severe? If so, proceed to step three. If not, then the claimant is not disabled.  *See* 20 C.F.R. §§ 404.1520C, 416.920C.

3. Does the impairment "meet or equal" one or more of the specific impairments described in 20 C.F.R. Pt. 404, Subpt. P, App. 1? If so, then the claimant is disabled. If not, proceed to step four.  *See* 20 C.F.R. §§ 404.1520(d), 416.920(d).

4. Is the claimant able to do any work that he or she has done in the past? If so, then the claimant is not disabled. If not, proceed to step five.  *See* 20 C.F.R. §§ 404.1520(e), 416.920(e).

5. Is the claimant able to do any other work? If so, then the claimant is not disabled. If not, then the claimant is disabled.  *See* 20 C.F.R. §§ 404.1520(f), 416.920(f).

2

*Bustamante v. Massanari*, 262 F.3d 949, 954 (9th Cir.2001).

The claimant bears the burden of proof during steps one through four. *Id*. at 953. The Commissioner bears the burden of proof at step five of the process, where the Commissioner must show the claimant can perform other work that exists in significant numbers in the national economy, "taking into consideration the claimant's residual functional capacity, age, education, and work experience." *Tackett v. Apfel*, 180 F.3d 1094, 1100 (9th Cir.1999); *see also* 20 C.F.R. § 404.1566 (describing "work which exists in the national economy"). If the Commissioner fails to meet this burden, then the claimant is disabled. If, however, the Commissioner proves that the claimant is able to perform other work that exists in significant numbers in the national economy, then the claimant is not disabled. *Bustamante*, 262 F.3d at 953-54.

### III. BACKGROUND

Plaintiff filed an application for Supplemental Security Income on November 3, 2009. (Administrative Record ("AR") at 82.) Plaintiff alleged disability beginning September 9, 1995. (AR 235.) Plaintiff's application alleged disability due to a learning disability and hypothyroidism. (AR 87.) The Social Security Administration ("SSA") denied Plaintiff's application. (*Id*.) On July 21, 2010, Plaintiff requested a hearing before an ALJ. (AR 97.) ALJ James S. Carletti held a hearing on May 13, 2011. (AR 45.) Plaintiff appeared at the hearing represented by her attorney, Jon M. Argenziano. (*Id*.) Gloria Lasoff, M.A., an impartial vocational expert, Dr. Kent Layton, M.D., an impartial medical expert ("ME"), and Patricia Barbalich, Plaintiff's mother, also appeared and testified.

**A.    Relevant Medical Records Submitted to ALJ for Review**

      **1.    Psychoeducational Evaluation, Dr. Marie Hewitt, Ph.D., September 11, 2003**

On September 11, 2003, Plaintiff visited Dr. Marie Hewitt for a psychoeducational evaluation. (AR 369.) This evaluation noted her previous IQ scores on the Wechsler Intelligence Scale for Children. In November 1997, Plaintiff's scores were: verbal – 94, performance – 78, and full scale – 85. (AR 370.) On July 20, 2000, Plaintiff's scores were: verbal – 80, performance – 58, and full scale – 60. (*Id*.) On October 4, 2000, Plaintiff's scores were: verbal – 60, performance – 52, and full scale – 52. (*Id*.) Dr. Hewitt then administered the Wechsler Abbreviated Scale of Intelligence test to Plaintiff and her scores were: verbal – 76, performance – 64, and full scale – 68. (AR 371.) Dr. Hewitt noted that while

Plaintiff's test scores were variable across time, she felt they provided an accurate indicator of Plaintiff's innate ability level as they appeared consistent with her observations. (AR 372.) Dr. Hewitt then observed Plaintiff's behavior and summarized her observations. She found that Plaintiff was functioning in the mildly developmentally delayed range of measured ability, with verbal skills being moderately superior to performance skills. Her visual-motor integration skills were approximately 7 ½ years below age level, and her visual memory skills were extremely low for her age. Dr. Hewitt recommended that she receive special education services. (*Id*.)

> **2.      Medical Records, Rady Children's Hospital, February 26, 2009 - December 10, 2009**
>
> **a.      Dr. Thomas G. Kelly, M.D.**

On February 26, 2009, due to increased Thyroid Stimulating Hormone ("TSH") levels, Plaintiff sought treatment for acquired hypothyroidism from Dr. T. Kelly at Rady Children's Hospital. (AR 439.) Dr. Kelly noted that despite increased TSH levels, Plaintiff denied experiencing any symptoms associated with hypothyroidism except weight decrease. (*Id*.) Dr. Kelly noted that Plaintiff had been on levothyroxine since September 2005 and there was a long-standing history of noncompliance. (AR 439.) Dr. Kelly's impression was that Plaintiff acquired hypothyroidism as a result of definitive therapy for Graves disease after she was treated with radioactive iodine. (AR 440.) While she has a history of noncompliance, Plaintiff was reported as being compliant with her current dose of Levoxyl. (*Id*.) Due to increased TSH levels, Dr. Kelly adjusted Plaintiff's Levoxyl to 175 mcg once daily and requested Plaintiff to return in 4 months. (*Id*.)

On June 25, 2009, Plaintiff sought follow-up treatment for her hypothyroidism from Dr. Kelly. (AR 437.) Dr. Kelly noted that since Plaintiff's last treatment, her family stated she had been compliant with her medication and there had been no report of any missed doses. (*Id*.) Dr. Kelly reported Plaintiff had not suffered from any significant illness and stated that she was feeling well and had reported no other symptoms of hypothyroidism. (*Id*.)  Dr. Kelly's impression was that Plaintiff is clinically euthyroid (the state of having normal thyroid gland function) on her current dose of levothyroxine. (AR 438.)

On June 28, 2010, Plaintiff submitted a form for the Administrative Record regarding her recent medical treatment stating that she had not been able to make an appointment with Dr. Kelly because she

1    does not have Medi-Cal. (AR 294.) Plaintiff stated her only medication is levothyroxine, which she

2    takes once daily. (AR 296.)

3              **b.      Dr. Jane J. Kim, M.D.**

4              On December 10, 2009, Plaintiff sought treatment for her hypothyroidism from Dr. J. Kim at

5    Rady Children's Hospital. (AR 434.) Plaintiff had a thyroid function test conducted through her primary

6    care provider, Dr. McFarland, in August of 2009. (*Id*.) Dr. McFarland found Plaintiff's TSH levels

7    elevated and recommended an increase in levothyroxine (from 175 mcg per day to 176 mcg per day),

8    although he was concerned regarding medication compliance and suspected Plaintiff likely skipped

9    doses. (AR 436.) Plaintiff reported that she has been compliant with her medication with no missed

10   doses and she had no significant illnesses, although she complained of occasional headaches. (AR 434.)

11   Dr. Kim reported he did not think the headaches were related to Plaintiff's thyroid condition. (AR 436.)

12   Dr. Kim also found Plaintiff to be clinically euthyroid (the state of having normal thyroid gland

13   function) on her current dose of levothyroxine. (AR 435.)

14            **3.      Psychological Evaluation, Dr. Colette Valette, Ph.D., February 4, 2010**

15            On February 4, 2010, the California Department of Developmental Services ("DDS") consulted

16   Dr. C. Valette for a complete psychological evaluation of history, mental status, and report. (AR 457.)

17   Dr. Valette conducted a Wechsler Adult Intelligence test with Plaintiff which yielded the following

18   scores: verbal – 90, performance – 69, full scale – 80. (AR 459.) Dr. Valette noted that the significant

19   difference between the scores indicates a learning disorder, and this learning disorder deflated her

20   scores. (*Id*.) Because of this deflation, Dr. Valette estimated that Plaintiff is intellectually functioning in

21   the low average to average range. (*Id*.) Dr. Valette concluded, however, that Plaintiff presents as though

22   she is intellectually functioning in the average range. (AR 460.) Finally, Dr. Valette found Plaintiff's

23   only limitation was a slight limitation on her ability to complete complex tasks, due to her learning

24   disorder. (*Id*.)

25            **4.      Department of Disability Services Medical Evaluation, January 25, 2010**

26            The DDS consulted Dr. M. Yee, a disability review physician, to interpret Plaintiff's medical file

27   and advise the department on Plaintiff's thyroid condition. (AR 454-455.) Dr. Yee opined that Plaintiff's

28   hypothyroidism was treatable and should not last a year. (AR 455.) He agreed that there was no 12-

1  month period where her hypothyroidism would have been severe. (*Id*.) Dr. Yee concluded, "Claimant

2  does not appear to have severe functional deficits as a result of her thyroid condition." (*Id*.)

3       **5.**     **Residual Functional Capacity Assessment, DDS, February 9, 2010**

4       The DDS disability review physician, Dr. H. Amado, M.D., assessed Plaintiff's residual

5  functional capacity. (AR 473.) After reviewing Plaintiff's medical file, he opined that, "the [record]

6  supports the presence of a cognitive medically determinative impairment ("MDI") which would not

7  preclude entry-level unskilled work activity." (AR 471.) Dr. Amado also found that given the minimal

8  findings from school records, Dr. Valette's clinical evaluation ("CE") should be assigned greater weight.

9  (AR 477.) He also noted that, "Mental allegations were credible, but not at adult listing levels." (AR

10  471.) He concluded "the CE results suggest that Plaintiff would not have any significant limitations."

11  (AR 477.)

12       **6.**     **Psychological Evaluation, Dr. Beatriz E. C. Netter, Ph.D., May 5, 2010**

13       Plaintiff was given a psychological evaluation on May 5, 2010, by clinical psychologist Dr. B.

14  Netter, for a determination of eligibility for services due to suspicion of mental retardation. (AR 652.)

15  Plaintiff was also given a Wechsler Adult Intelligence test which yielded the following scores: verbal –

16  66, perceptual reasoning – 65, working memory – 73, processing speed – 71, and full scale – 60. (AR

17  655.) After reviewing her relevant history and interviewing Plaintiff and her mother, Dr. Netter

18  concluded that Plaintiff meets criteria for mild mental retardation because her full scale IQ is in the

19  extremely low range and she demonstrates deficits in adaptive functioning. (AR 658.) In addition,

20  Plaintiff's documented learning difficulties throughout her school years, and current participation in a

21  transitional program following completion of high school, are consistent with such a diagnosis. (*Id*.) Dr.

22  Netter recommended Plaintiff would continue to benefit from the transitional program with an emphasis

23  on the continued development of independence skills and job training. (*Id*.) Dr. Netter also suggested

24  that in order to live independently, Plaintiff "is likely to require much guidance and assistance. It will

25  also be important to assist [Plaintiff] in making sure she understands and follows any medical directions

26  for her physical conditions in the future." (*Id*.)

27

28

### 7.    School Psychologist Evaluation, Althea Miller, May 13, 2010

Plaintiff was given a triennial evaluation by Grossmont Union High School District school psychologist Althea Miller on May 13, 2010. During this evaluation, she was given a Wechsler Adult Intelligence test which yielded the following scores: verbal - 59, performance scale - 58, and full scale - 55. (AR 489.) Ms. Miller observed Plaintiff is functioning in the mildly delayed range of intelligence. She also observed Plaintiff showed relative strengths in her functional reading skills, her knowledge of domestic procedures (such as food preparation and laundry), and her time-telling abilities. (AR 490) Ms. Miller concluded Plaintiff's overall adaptive skills appear to fall within the mildly delayed range. (*Id*.) The conclusion of Ms. Miller's report is that Plaintiff is eligible for special education based on mental retardation and her disability is characterized by significant cognitive and adaptive delays. (AR 491.) Ms. Miller found Plaintiff's educational and transitional needs are being met in her current transition program [special day class placements and speech/language therapy at Santee School District]. (*Id*.)

### 8.    DDS Medical Evaluation, Department of Disability Services, June 28, 2010

Plaintiff later reported to the DDS that her condition had changed and she would no longer take the trolley, could not follow rules or signs, needed guidance, and was on new thyroid medication. (AR 575.) The DDS consulted Dr. K. Whal, M.D. and Dr. N. Haroun, M.D., to review Plaintiff's medical records and provide a case analysis regarding the alleged changed condition. After reviewing the records, Dr. Whal opined that the objective evidence did not contribute to a material change increasing Plaintiff's functional limitations as alleged by Plaintiff. (AR 577.) Dr. N. Haroun, M.D., reported the "psychological testing completed within months of each other is not considered reliable." (*Id.*) He also stated he would give more weight to the clinical evaluation by Dr. Valette because it was the first exam in the series of IQ tests. (*Id.*) He concluded Plaintiff's functioning did not support the alleged worsening and was consistent with the results found at the initial assessment. (*Id.*)

## B.    Hearing Testimony

Claimant was 20 years old at the time of the hearing. (AR 48.) Claimant testified that she finished high school and attends a vocational transition school Monday through Friday from 7:00 a.m. to 1:00 p.m. (AR 48, 49.) Claimant testified that she has never been employed but does volunteer work.

1    (AR 48-49.) Claimant testified that she currently lives with her mother. (AR 49.) Claimant testified that

2    when she finishes her education, she wants to work at a restaurant as a hostess. (AR 48.)

3         When the ALJ asked Claimant about her thyroid problem, she testified that she takes medication

4    for it every day in the way that her doctor prescribed. (AR 49.)  Claimant also agreed that her

5    medication takes care of her thyroid problem. (*Id*.) Claimant testified that she sees her thyroid doctor,

6    Dr. Kelly, every three months. (*Id*.)

7         When Claimant's attorney asked her about school, she stated that at school they focus on

8    independence and different learning skills, including how to pay bills and count change. (AR 51-51.)

9    Claimant stated that she "doesn't get" counting change and dealing with money is still hard for her. (AR

10   52.) Outside of school, claimant testified she takes the trolley by herself and she knows all the stops.

11   (AR 50, 54.) She also testified that she can read, but finds spelling hard. (AR 50.) As for daily living

12   skills, Claimant testified that she runs errands with her mom, does the dishes, and folds laundry, but she

13   cannot wash laundry because she cannot measure the soap. (AR 53.)

14        After the Medical Expert, Dr. Layton, questioned Claimant, he testified that his opinion is

15   Claimant is mildly developmentally disabled and has a learning disorder. (AR 56.) The Medical Expert

16   based this finding on a teacher questionnaire from one of Claimant's teachers, his review of the record,

17   and Claimant's testimony at the hearing. The teacher questionnaire stated Claimant has a serious

18   problem with vocabulary, comprehending written material, comprehending and doing math problems,

19   and more than difficulty in expressing ideas in written form. (AR 56.) The Medical Expert also noted

20   that this questionnaire was backed up by Claimant's testimony regarding her inability to count change at

21   the hearing. (*Id*.) The teacher questionnaire, however, stated that Claimant is able to understand and

22   participate in class. (*Id*.) This account is supported, as the Medical Expert stated, by Claimant's ability

23   to comprehend oral instructions, provide oral explanations, and provide adequate descriptions at

24   Claimant's hearing testimony. (*Id*.)  With regard to reading and applying learned material, the Medical

25   Expert testified that while Claimant has difficulty acquiring information and applying problem solving

26   skills, once she has learned something, she can do it. (AR 56.) With regard to attending and completing

27   tasks, Claimant's teacher wrote that she is affected by the complexity of tasks, so the tasks must be

28   simple. (AR 57.) Specifically, the Medical Expert concluded that any task would have to be simple and

1    repetitive for Claimant to be effective at it. (AR. 56.) Regarding Claimant's social abilities, her chart

2    indicates that she has: (1) a moderate problem maintaining relevant appropriate topics of conversation,

3    (2) a slight problem regarding seeking attention appropriately, and (3) low vocabulary, but is otherwise

4    congenial and social. (AR 57.) In regard to caring for herself, the Medical Expert testified she has a

5    moderate problem concerning personal safety in dangerous situations but has no other problems in that

6    area. (AR 57.) When the ALJ asked the Medical Expert what his assessment would be, he responded

7    that Claimant would be able to perform simple repetitive tasks in a work environment as long as she is

8    given the instruction. (AR 58.) He stated that it would probably take a little longer, it would have to be

9    explained and demonstrated, but she would be able to do it as long as it was not complex. (*Id*.) He also

10   testified, Claimant would likely have a mild limitation interacting with the public, coworkers, or

11   supervisors. (*Id*.)

12        As to Claimant's IQ scores, the Medical Expert testified that because she has a learning

13   disability, her IQ scores are skewed low and are likely higher than what is reflected. (AR 57, 62.)

14   Regarding Claimant's full scale IQ score of 80 from her test with Dr. Valette, the Medical Expert

15   testified that it was inconsistent with other scores and that he would "go with the Regional Center"

16   scores. (AR 59-60.)  In determining which IQ score to focus on, the Medical Expert said that he would

17   take a cross section of all Plaintiff's scores, "which means she is somewhere between 52 and 85." (AR

18   61.)   Additionally, the Medical Expert testified the scores have a standard deviation of 10 and that he

19   would take an average of the scores, which would be around 70. (AR 62.) The Medical Expert did note,

20   however, that  the scores were low due to her learning disability and that it is likely she has a higher IQ

21   then the scores indicate. (AR 62-63.)

22        After Vocational Expert, Dr. Lazoff, reviewed the evidence in the record, the ALJ asked her,

23   "Assuming that we have a younger individual with a high school education obtained through special ed

24   and no past relevant work activity, if there were no physical limitations and there were limitations to

25   simple repetitive tasks, and I'll say nonpublic work environment, and minimal interaction with

26   coworkers and supervisors, would there be work activity that exists either nationally or locally that

27   could be performed?" (AR 67.) The Vocational Expert answered yes to the ALJ's hypothetical and gave

28   the example of laundry laborer. (*Id*.) The Dictionary of Occupational Titles ("DOT") indicates there are

1   approximately 2,000 positions locally and 400,000 positions nationally for a laundry laborer. (*Id.*) The

2   Vocational Expert also gave another example of a garment folder. (*Id.*) The DOT for a garment folder is

3   approximately 1,500 locally and 600,000 nationally. (*Id.*) These positions assume the capability of

4   sustaining 40 hours of work activity. (*Id.*)

5        Claimant's attorney then asked the vocational expert, would "the same individual as already

6   cited, but with a moderate limitation on persistence and pace, and a moderate limitation on ability to

7   complete a normal workweek, be able to complete those jobs that you just described?" (AR 67-68.) The

8   vocational expert responded that the hypothetical individual in the question posed by Claimant's

9   attorney would not be able to sustain full-time employment. (AR 68.)

10       The ALJ then questioned Patricia Barbalich, Claimant's mother. (AR 71.) Mrs. Barbalich

11  testified that Claimant has lived with her for Claimant's entire life. (*Id.*) The ALJ asked Mrs. Barbalich

12  why, in the report from the regional center, it notes areas where Claimant is making improvements but at

13  the conclusion of every section it states, "no change requested." (*Id.*) Mrs. Barbalich replied that she

14  believes they "don't want to change her because she is delayed" and "she has not caught up to where

15  they want her to be." (*Id.*) When the ALJ asked about Claimant's ability to ride the trolley, Mrs.

16  Barbalich said Claimant does not take the trolley to school and she can only take the trolley by herself if

17  the destination is in Santee. (*Id.*) She noted that Claimant has gotten lost but she has learned [the stops]

18  over the years. (*Id.*) Regarding Claimant's learning disability, the ALJ brought up Dr. Layton's opinion

19  that it takes Claimant a long time to learn something but when she does, as long as it is repetitive, "she's

20  got it." (AR 74.) In response, Mrs. Barbalich said Dr. Layton's opinion is "correct but then [Claimant]

21  forgets it and [they] have to start back at the beginning, which is why it's taken her so long to get where

22  she's at." (*Id.*) The ALJ then asked if Mrs. Barbalich has seen Claimant improving by "learning more

23  things to make her more independent." (AR 75.) Mrs. Barbalich responded yes, she has seen Claimant

24  improving in some areas. (*Id.*) Mrs. Barbalich then noted, however, that if she were to pass away she did

25  not think Claimant could make it on her own. (*Id.*) She said that she will send Claimant into the grocery

26  store and Claimant will be "too frightened and won't be able to do anything." (*Id.*) The ALJ then asked

27  what a normal day would be for Claimant. (AR 76.) Mrs. Barbalich responded Claimant wakes up,

28  showers, dresses, and makes her own meals if it is oatmeal or dry cereal. (*Id.*) When Claimant comes

1  home from school, she watches television and waits for her mother to come home before going

2  anywhere. (*Id.*)

3      Claimant's attorney then questioned Mrs. Barbalich. (AR 77.) He first asked Mrs. Barbalich

4  what her understanding was of what Claimant is doing in the vocational transitional school. (*Id.*) Mrs.

5  Barbalich responded, "They're trying to get her to the self-skills, basically, so she can do something

6  outside of her life. I don't know about a job, she's not quite there yet. We've tried to put her in one

7  before and she couldn't do it. She got shy and couldn't talk to people. She has terrible communication

8  skills." (*Id.*) Claimant's attorney asked Mrs. Barbalich if Claimant was taking "basic life skill kind of

9  classes." (*Id.*) Mrs. Barbalich responded "Yes, they are very simple little things that make a big huge

10  difference and other skills she could build on." (*Id.*) The Medical Expert then asked Mrs. Barbalich for

11  the grade level at which claimant behaved and she responded fifth or sixth grade. (AR 79.)

12      **C.      ALJ's Findings**

13      On July 21, 2011, the ALJ issued his decision denying benefits. (AR 27-39.)  In arriving at his

14  decision, the ALJ applied the Commissioner's five step sequential disability determination process set

15  forth in 20 C.F.R. § 404.1520, as described above. The ALJ agreed that Plaintiff had not engaged in

16  substantial gainful activity during the relevant period. (AR 29.) Accordingly, the ALJ found that

17  Plaintiff satisfied step one. (*Id.*)

18      At step two, the ALJ found that Plaintiff suffered from the following severe impairment: learning

19  disability. (AR 29.) Also at step two, the ALJ found that Plaintiff's hypothyroidism is supported by the

20  record but is nonsevere. (AR 30.) Thus, with regard to Plaintiff's learning disability, the ALJ found that

21  Plaintiff satisfied step two. (AR 29.)

22      At step three, the ALJ found that Plaintiff did not have an impairment or combination of

23  impairments that met or medically equaled one of the listed impairments. (AR 30.) The Claimant's

24  hypothyroidism was considered under § 9.00 of  20 C.F.R. Pt. 404, Subpart P, Appendix 1, pertaining to

25  endocrine disorders. Section 9.00 explains that since endocrine disorders can result in a variety of

26  complications in other body systems, impairments resulting from endocrine disorders should be

27  evaluated under the listing for the other body system affected, if any. 20 C.F.R. Pt. 404, Subpart P,

28  Appendix 1, Listing § 9.00. The ALJ found that there was no other impairment or body system affected

11

1   by the Claimant's hypothyroidism. (AR 30.) Accordingly, the Claimant's thyroid impairment did not

2   meet listing level severity. (*Id*.)

3     The Claimant's mental impairment was considered under the requirements of listing § 12.05,

4   pertaining to intellectual disability. Section 12.05 explains that mental retardation refers to significantly

5   subaverage general intellectual functioning with deficits in adaptive functioning initially manifested

6   during the developmental period; *i.e.*, the evidence demonstrates or supports onset of the impairment

7   before age 22.  20 C.F.R. Pt. 404, Subpart P, Appendix 1, Listing § 12.05. The required level of severity

8   for this disorder is met when the requirements in paragraphs A, B, C, or D of § 12.05 are satisfied. (*Id*.)

9   The requirements in paragraph A are met when there is a mental incapacity evidenced by dependence

10  upon others for personal needs (e.g., toileting, eating, dressing, or bathing) and inability to follow

11  directions such that the use of standardized measures of intellectual function is precluded. The ALJ

12  found Claimant did not meet the requirements for paragraph A because she has no problem with

13  personal care activities, was able to prepare simple foods, helped with household cleaning, and took

14  routine public transportation. (AR 30.)

15    The severity requirements for mental impairment in paragraph B are met when the there is a

16  valid verbal, performance, or full scale IQ of 59 or less. 20 C.F.R. Pt. 404, Subpart P, Appendix 1,

17  Listing § 12.05(B). The ALJ found Claimant did not meet the requirements for paragraph B. (AR 31.)

18  Claimant took multiple IQ tests between 1997 and 2003 yielding the following full scale IQ scores: 52,

19  61, 67, 68, and 85. (*Id*.) While Claimant had one IQ score of 59 or less, the ALJ found her IQ score of

20  52 was not reliable because Claimant's remaining IQ scores exceeded the requirement of 59. (*Id*.)

21  Additionally, the ALJ noted that Claimant was administered an IQ test on February 4, 2010 by

22  consultive examiner Dr. Valette, who indicated Claimant's prorated full-scale IQ score was 80 and the

23  significant difference between Claimant's verbal, performance, and full scale IQ scores indicated a

24  learning disability, which would deflate the Claimant's scores. (*Id*.)  On May 5, 2010, Claimant took an

25  IQ test that yielded a full scale score of 60. (*Id*.) The ALJ also based his determination on the testimony

26  of Medical Expert Dr. Layton, who opined at the hearing that Claimant's IQ scores varied too widely

27  which suggested unreliability. Dr. Layton also opined that because Claimant had a learning disability,

28  she really had a higher IQ score than IQ testing reflected. (*Id*.) Based on the wide variety of IQ scores,

1  and the nature of Claimant's mental impairment, the ALJ found Claimant's single IQ score falling

2  below 59 was too unreliable to meet the requirements of paragraph B.

3          The severity requirements for mental impairment in paragraph C are met when there is a valid

4  verbal, performance or full scale IQ of 60 through 70 and a physical or other mental impairment

5  imposing an additional and significant work-related limitation of function. 20 C.F.R. Pt. 404, Subpart P,

6  Appendix 1, Listing § 12.05C**.** The ALJ found Claimant did not meet the requirements for paragraph C.

7  (AR 31.) While Claimant had at least three IQ scores between 60 and 70, the ALJ noted that Dr. Layton

8  and Dr. Valette both indicated Claimant's learning disability deflated her IQ scores such that her actual

9  IQ would be higher than the tests results suggested. (*Id*.)  The ALJ also found that even if Claimant's IQ

10  scores were reliable indications of her intellectual functioning, she did not have another severe

11  impairment to meet the requirements of paragraph C. (*Id*.)

12          The severity requirements for mental impairment in paragraph D are met when there is a valid

13  verbal, performance, of full scale IQ of 60 through 70, resulting in at least two of the following: 1.)

14  Marked restriction of activities of daily living; 2.) Marked difficulties in maintaining social functioning;

15  3.) Marked difficulties in maintaining concentration, persistence, or pace or; 4.) Repeated episodes of

16  decompensation, each of extended duration. 20 C.F.R. Pt. 404, Subpart P, Appendix 1, Listing §

17  12.05(D). The ALJ found Claimant did not meet the requirements for paragraph D. (AR 31.) Relying on

18  the Claimant's testimony, the ratings of Medical Expert Dr. Layton, and State agency consultant H.

19  Amado, M.D., the ALJ found Claimant had only  moderate restrictions in activities of daily living, no

20  restrictions in maintaining social functioning, moderate restrictions in maintaining concentration,

21  persistence, or pace, and no episodes of decompensation. (AR 31.) The ALJ, therefore, proceeded to

22  step four of the sequential disability determination process.

23          The fourth and fifth steps require the ALJ to determine how the Claimant's impairments affect

24  the Claimant's ability to perform work. To make this determination, the ALJ formulates the Claimant's

25  residual functional capacity ("RFC"). The RFC is the most [Claimant] can still do despite [his or her]

26  limitations. 20 C.F.R. § 404.1545(a)(1). The RFC is used at step four of the sequential evaluation

27  process to determine whether an individual is able to do past relevant work, and at step five to determine

28  whether an individual is able to do other work, considering his or her age, education, and work

experience. Social Security Ruling ("SSR") 96–8p. The ALJ found Plaintiff had the RFC to perform a full range of work at all exertional levels, but with the following nonexertional limitations: simple, repetitive tasks, in a non-public work environment, with minimal interaction with co-workers and supervisors. (AR 33.)

In determining Plaintiff's RFC, the ALJ dismissed Plaintiff's testimony concerning the impact of her learning disorder. (AR 34.) The ALJ concluded that, while Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms…the Claimant's statements concerning the intensity, persistence, and limiting effects of those symptoms are not credible." (AR 34.) In discrediting Plaintiff's testimony, the ALJ relied on Claimant's education records, which reflected overall growth in support of a finding that Claimant's learning disorder is not disabling. (AR 34-35.)

The ALJ also considered opinion evidence to determine Plaintiff's RFC. The ALJ gave "significant weight" to Medical Expert Dr. Layton's opinion that Claimant could perform simple, repetitive tasks in a work environment and would have generally mild limitations in interacting with the public, co-workers, or supervisors. (AR 35.) Additionally, the ALJ gave "significant weight" to Claimant's teacher, Ms. Weckerly, who opined in her teacher questionnaire that Claimant had "only a slight problem in comprehending oral instructions or discussions" and "once Claimant learned a skill, and successfully repeated it, she maintained the skill." (AR 36.) Finally, the ALJ gave "great weight" to the assessment of State agency consultant Dr. Amado that Claimant was not precluded from performing entry-level unskilled work activity. (*Id.*) The ALJ gave only "some weight" to the opinion of examiner Dr. Netter, that Claimant would likely require much guidance and assistance in order to live independently, because the opinion did not contain a specific functional assessment. (*Id.*) The ALJ also gave only "some weight" to consultative examiner Dr. Valette's assessment that Claimant had no limitation in her ability to: (1) interact socially, (2) understand instructions, (3) sustain an ordinary routine, (4) complete simple and detailed tasks, (5) concentrate for two-hour increments in order to maintain regular work, and (6) avoid normal hazards; and that Claimant only had a "slight limitation" in her ability to complete complex tasks. (*Id.*) The ALJ found Claimant actually has slightly greater limitations than those opined by Dr. Valette. (*Id.*) Finally, the ALJ gave "some weight" to the testimony

of Claimant's mother, Ms. Patricia Barbalich, to the extent that it was consistent with Claimant's school records reflecting improvement. (AR 37.)

After an ALJ formulates a claimant's RFC, he must consider whether, in light of that RFC, the claimant can perform past or other work. To do so, the ALJ may rely on the testimony of a vocational expert ("VE"). 20 C.F.R. §§ 404.1560(b)(2) and 404.1566(e). Typically, the ALJ asks the VE whether, given certain hypothetical assumptions about the Claimant's capabilities, the claimant can perform certain types of jobs, and the extent to which such jobs exist in the national economy. *Burkhart v. Bowen*, 856 F.2d 1335, 1340 n.3 (9th Cir. 1988). In response to the hypothetical question, the VE must identify a specific job or jobs in the national economy with requirements that a person with Claimant's physical and mental abilities and vocational qualifications would satisfy. *Osenbrock v. Apfel,* 240 F.3d 1157, 1162–63 (9th Cir. 2001). The job must exist in significant numbers either in the region where [the claimant] live[s] or in several other regions of the country. 20 C.F.R. § 404.1566(a)

Here, Claimant had no past relevant work. (AR 37.) Therefore, in order to determine whether Claimant was capable of making a successful adjustment to other work that exists in significant numbers in the national economy, the ALJ considered the Claimant's residual functional capacity, age, education, the VE's testimony and the Medical-Vocational Guidelines. (AR 38; 20 CFR Part 404, Subpart P, Appendix 2.) The ALJ found Claimant was capable of making a successful adjustment to other work that exists in significant numbers in the national economy. (AR 38.) Therefore, the ALJ ultimately concluded that a finding of not disabled was appropriate and claimant had not been under a disability, as defined in the Social Security Act, since November 3, 2009, the date the application was filed. (*Id*.) The Claimant appealed the ALJ's decision to the Appeals Counsel. The Appeals Counsel denied her request for review. (AR 1.)

## IV. SCOPE OF REVIEW

Section 205(g) of the Social Security Act allows unsuccessful applicants to seek judicial review of a final agency decision. 42 U.S.C. § 405(g). The scope of judicial review is limited. *See* 42 U.S.C.A. § 405(g). This Court has jurisdiction to enter a judgment affirming, modifying, or reversing the Commissioner's decision. *See* 42 U.S.C.A. § 405(g); 20 C.F.R. § 404.900(a)(5). The matter may also be remanded to the Social Security Administration for further proceedings. *Id.*

The Commissioner's decision must be affirmed upon review if it is: (1) supported by "substantial evidence" and (2) based on proper legal standards. *Uklov v. Barnhart*, 420 F.3d 1002, 1004 (9th Cir. 2005). If the Court, however, determines that the ALJ's findings are based on legal error or are not supported by substantial evidence, the Court may reject the findings and set aside the decision to deny benefits. *Aukland v. Massanari*, 257 F.3d 1033, 1035 (9th Cir. 2001). Substantial evidence is more than a scintilla but less than a preponderance. *Connett v. Barnhart*, 340 F.3d 871, 873 (9th Cir. 2003). It is "relevant evidence that, considering the entire record, a reasonable person might accept as adequate to support a conclusion." *Id*.; *see also Howard ex rel. Wolff v. Barnhart*, 341 F.3d 1006, 1012 (9th Cir. 2003) (finding substantial evidence in the record despite the ALJ's failure to discuss every piece of evidence). "Where evidence is susceptible to more than one rational interpretation," the ALJ's conclusion must be upheld. *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005). This includes deferring to the ALJ's credibility determinations and resolutions of evidentiary conflicts. *See Lewis v. Apfel*, 236 F.3d 503, 509 (9th Cir. 2001). Nevertheless, the Court "must consider the entire record as a whole and may not affirm simply by isolating a specific quantum of supporting evidence." *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006).

## V. DISCUSSION

At step three of the five-step evaluative process, the ALJ considered Plaintiff's mental impairment under the requirements of listing § 12.05, which pertains to intellectual disability. The ALJ found Plaintiff did not have an impairment or combination of impairments that qualified as a listed impairment. (AR 30.) To meet the requirements of Listing § 12.05C, a claimant must demonstrate: "(1) subaverage intellectual functioning with deficits in adaptive functioning initially manifested before age 22;[1] (2) an IQ score of 60 through 70; 3) a physical or other mental impairment causing additional and significant work-related limitation." *Kennedy v. Colvin*, 738 F.3d 1172, 1176 (9th Cir. 2013*)*.

In her motion for summary judgment, Plaintiff specifically challenges the ALJ's determination that all of the requirements of Listing § 12.05C were not met. She argues: (1) the ALJ committed legal error by failing to credit her lowest IQ score and instead finding Plaintiff's various IQ scores within the

---

[1]The ALJ's decision found "the evidence demonstrates or supports onset of Plaintiff's mental impairment before age 22." Accordingly, Plaintiff does not contest the ALJ's determination as to the first element of Listing § 12.05C. (AR at 30.)

1   60 to 70 range were invalid for purposes of meeting Listing § 12.05(C)(I); and (2) the ALJ committed

2   legal error by finding Plaintiff did not meet Listing § 12.05(C)(ii) in light of her learning disorder, which

3   should qualify as an additional mental impairment.  Plaintiff also argues the ALJ's determination of

4   Plaintiff's Residual Functional Capacity, used at step four of the sequential evaluation process to

5   determine whether an individual is able to do past relevant work, is not supported by substantial

6   evidence. (Doc. No.15-1.)

7         **A.   The ALJ's Assessment of The Validity of Plaintiff's Various IQ Scores**

8         The text of 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.05C, requires an IQ score to be "valid." *See*

9   20 C.F.R. Pt. 404, Subpt. P, App. 1, ("a valid verbal, performance, or full scale IQ of 60 through 70").

10  When deciding the validity of IQ scores, "the Commissioner…may disregard test scores that are

11  inconsistent with an applicant's demonstrated activities and abilities as reflected in the record as a

12  whole." *Clay v. Barnhart*, 417 F.3d 922, 929 (8th Cir. 2005) *(citing Muncy v. Apfel,* 247 F.3d 728, 733

13  (8th Cir. 2001); *Clark v. Apfel,* 141 F.3d 1253, 1255 (8th Cir .1998)) *see also*, *Markle v. Barnhart*, 324

14  F.3d 182, 186 (3d Cir. 2003) (noting that Commissioner is not required to accept a claimant's IQ scores

15  and may reject scores that are inconsistent with the record); *Muse v. Sullivan*, 925 F.2d 785, 790 (5th

16  Cir.1991) (noting that an ALJ may make factual determinations on the validity of IQ scores).

17  Accordingly, the ALJ may discount an IQ score as invalid when there is substantial evidence in the

18  record to support his conclusion. *See, e.g., Muse v. Sullivan*, 925 F.2d 785, 788-90 (5th Cir. 1991);

19  *Hutsell v. Sullivan*, 892 F.2d 747, 750-51 (8th Cir. 1989); *Popp v. Heckler*, 779 F.2d 1497, 1499-1500

20  (11th Cir. 1986).  Here, the ALJ found Plaintiff did not have a valid IQ score of 60 through 70, as

21  required by § 12.05C.

22        **1.   The ALJ Properly Rejected Plaintiff's IQ Scores Falling Below 59**

23        If an ALJ rejects the results of an IQ test, he must state his reasons for doing so. *Soto v. Sec'y of*

24  *Health & Human Servs*., 795 F.2d 219 (1st Cir. 1986).  Accordingly, in rejecting the validity of

25  Plaintiff's various IQ scores, the ALJ began his analysis with Plaintiff's lowest full scale IQ score of 52

26  from a test administered by the Santee School District on October 4, 2000 when Plaintiff was 9.  (AR

27  370.)  As detailed in the Background section *supra*, Claimant took multiple IQ tests between 1997 and

28  2003 yielding the following full scale IQ scores: 52, 61, 67, 68, and 85. *(AR 31.)*  These results,

17

1    however, are not sufficiently current to be considered for adult disability purposes under 20 C.F.R. Pt.

2    404 Subpart P, Appendix 1, Listing § 112.00(D)(10) which provides:

3

4            "IQ test results must also be sufficiently current for accurate assessment under 112.05.
             Generally, the results of IQ tests tend to stabilize by the age of 16. Therefore, IQ test results
             obtained at age 16 or older should be viewed as a valid indication of the child's current status,

5            provided they are compatible with the child's current behavior. IQ test results obtained between
             ages 7 and 16 should be considered current for 4 years when the tested IQ is less than 40, and for

6            2 years when the IQ is 40 or above. IQ test results obtained before age 7 are current for 2 years if
             the tested IQ is less than 40 and 1 year if at 40 or above."

7

8    Because the scores ranging from 52 to 85 were taken when Plaintiff was at the age of 12 or under, they

9    were not sufficiently accurate for the ALJ to consider in his decision.  Nevertheless, the ALJ appears to

10   have factored Plaintiff's lowest score of 52 into his decision regardless.  To invalidate Plaintiff's lowest

11   historical IQ score of 52, the ALJ explained that consultative examiner, Dr. Valette, found Plaintiff's

12   wide range of IQ scores were indicative of a learning disorder which artificially deflated her scores.

13   (AR 31.)  As further support for his determination that Plaintiff's IQ score of 52 was unreliable, the ALJ

14   cited Plaintiff's prorated full-scale IQ score of 80 on the February 4, 2010, Wechsler Adult Intellectual

15   Scale III test as administered by Dr. Valette, who estimated in his narrative report, that Plaintiff was

16   functioning intellectually in the low-average to average range. (*Id.*; *see also* Exh. 7F at AR 458-460.)

17         Although the ALJ erroneously considered and rejected an out-dated score, it appears from his

18   written decision that he intended his reasoning to also apply to Plaintiff's sufficiently current full-scale

19   IQ score of 55 from a test administered by the Grossmont Union High School when Plaintiff was 19.

20   (AR 489.)  To invalidate any score falling below 59, the ALJ indicated that he also relied on the

21   testimony of medical expert Dr. Kent Layton.  (AR 31.)  Dr. Layton confirmed at the hearing on

22   Plaintiff's disability claim, that Plaintiff's scores varied too widely to be reliable.  Specifically, Dr.

23   Layton opined that because Plaintiff had a learning disability, she had a higher IQ score than her

24   variable scores, including the score of 55 in 2010, reflected. (AR at 57.)

25         An ALJ may assess the reliability of IQ scores by examining the record.  *See, e.g. Clark v. Apfel*,

26   141 F.3d 1253, 1255 (8th Cir. 1998).   In addition, the Regulations allow an ALJ to consider the narrative

27   reports accompanying Plaintiff's IQ scores.  *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(D)(6)(a)

28   (Since the results of intelligence tests are only part of the overall assessment, the narrative report that

accompanies the test results should comment on whether the IQ scores are considered valid and consistent with the developmental history and the degree of functional limitation).  Given, (1) the range of Plaintiff's historical IQ scores of 52, 61, 67, 68, and 85 as well as her adult IQ scores of 55, 60 and 80 as demonstrated in the Administrative Record; (2) the explanatory narrative reports in conjunction with those scores indicating Plaintiff functions "minimally in the low average range" (AR 460) or "extremely low range"(AR 520); and (3) expert testimony opining that her learning disability deflates Plaintiff's scores, the Court finds, and Plaintiff does not contest, that substantial evidence supports the ALJ's decision to invalidate Plaintiff's IQ scores which  fell below 59.  *Clay v. Barnhart*, 417 F.3d 922, 929 (8th Cir. 2005) *(citing Muncy v. Apfel,* 247 F.3d 728, 733 (8th Cir. 2001)( "the Commissioner…may disregard test scores that are inconsistent with an applicant's demonstrated activities and abilities as reflected in the record as a whole.").

### 2.  The ALJ Properly Rejected Plaintiff's IQ Scores Falling Below 70

The ALJ also found Plaintiff did not have a valid IQ score of 60 through 70, as required by § 12.05C.  In order to invalidate Plaintiff's sufficiently current IQ score of 60, which was administered by Dr. Beatriz Netter of the San Diego Regional Center when Plaintiff was 19, the ALJ cited the same evidence used to discount Plaintiff's scores which fell below 59.  Plaintiff's score of 60 would have placed Plaintiff in the 60 to 70 range necessary to meet a component of  Listing 12.05C.  Accordingly, Plaintiff challenges the ALJ's approach as over-inclusive and argues that where multiple IQ scores are available, as is the case here, the next lowest valid score must always be utilized for purposes of evaluating a § 12.05 listing. (Doc. No. 15-1 at 9.)  Plaintiff's argument stems from the district court's discussion in *Ray v. Chater*, 934 F. Supp. 347, 350 (N.D. Cal. 1996) on the issue of whether an IQ score of 67 or 72 would be used to determine whether the Plaintiff in that case met section 12.05(C)'s requirement of a valid full-scale IQ of 60 through 70.  The *Ray* court reasoned:

> "When there are differing scores from two different I.Q. tests, the regulations do not specify which score should be relied upon.  However, the regulations do state "'[w]here more than one I.Q. is customarily derived from the test administered, i.e. where verbal, performance, and full-scale I.Q. are provided ... the lowest of these is used in conjunction with listing 12.05.' Thus, it can be inferred that when multiple I.Q. scores are available the Regulations prefer the lowest score."

*See Ray v. Chater*, 934 F. Supp. at 350.

Therefore, for the purposes of this Court's review, the issue becomes whether the ALJ's decision to invalidate Plaintiff's other low IQ score on the grounds of unreliability, instead of choosing the lowest valid score, was similarly supported by substantial evidence.  In his written decision, the ALJ acknowledges that Plaintiff "had a few scores between 60 and 70."  (AR 31)  However, he invalidates these scores by summarily stating: "Dr. Layton and Dr. Valette both indicated that the claimant's learning disabling (sic) deflated her scores such that the actual IQ would be higher than the tests results suggested."  (*Id.*)  The ALJ does not provide any further written discussion in support of his conclusion to invalidate the remaining score of 60 and, as Plaintiff argues, does not address why this score was also deemed invalid when testifying medical expert, Dr. Layton, opined at the hearing that: (1) he would "go with the Regional Center [full-scale IQ score of 60]";[2] (2) the examining clinical psychologist for the Regional Center, Dr. Beatriz Netter, wrote in her psychological evaluation that the results of Plaintiff's testing were "deemed to be a valid representation of her current  functioning"(AR 517); and (3) Plaintiff's  full-scale IQ score of 80, achieved during Dr. Valette's testing, was considered by Dr. Layton to be "an outlie[r] or something outside the set." (AR at 59-60.)

In his written decision, the ALJ indicated he gave "significant weight" to the testimony of Dr. Layton, who as a medical expert, was a non-examining physician.  The ALJ also indicated he gave "some weight" to the opinions of consultative examiner Dr. Valette and examiner Dr. Netter.  The Court must determine whether the ALJ properly discounted Dr. Layton's non-examining opinion regarding a score that would be representative of Plaintiff's IQ in light of her learning disability in favor of the testing administered by consultative examiner Dr. Valette.  "Generally, the opinions of examining physicians are afforded more weight than those of non-examining physicians..." *Orn v. Astrue*, 495 F.3d 625, 631 (9th Cir. 2007) (citing 20 C.F.R. § 404.1527(d)(1)-(2)); see also 20 C.F.R. § 404.1527(d).  Accordingly, "[i]n conjunction with the relevant regulations, [the Ninth Circuit has] developed standards that guide [the] analysis of an ALJs weighing of medical evidence." *Ryan v. Comm'r of Soc. Sec.*, 528

---

[2]Dr. Layton later testified at the hearing that in light of Plaintiff's learning disorder, he would take a "cross section" of all of her scores from 1997 through 2010, which would average to approximately a full-scale IQ score between 70 to 75.  (AR 61-62.)  However, Dr. Layton's approach of averaging Plaintiff's IQ scores is not authorized under the Regulations.

F.3d 1194, 1198 (9th Cir.2008) (citing 20 C.F.R. § 404.1527).  Opinions of non-examining doctors alone cannot provide substantial evidence to justify rejecting an examining physician's opinion. *See* Morgan, 169 F.3d at 602.  An ALJ may rely partially on the statements of non-examining doctors only to the extent that independent evidence in the record supports those statements. *Id.*  Here, the ALJ properly credited Dr. Layton's opinion as to the deflating effect Plaintiff's learning disorder had on her IQ scores because it was consistent with Dr. Valette's similar finding as an examining physician and documented in the administrative record by Plaintiff's variable IQ scores over time.  *See Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 600 (9th Cir.1999)("Opinions of a nonexamining, testifying medical advisor may serve as substantial evidence when they are supported by other evidence in the record and are consistent with it.") However, it was also proper for the ALJ to discount that portion of Dr. Layton's testimony where he estimated that 70 to 75 was a better representation of Plaintiff's IQ score because the estimate was derived from an averaging method that is not acknowledged under the Regulations and is unsupported by the scores in the record.

Because the ALJ found Plaintiff had no valid IQ score of 60 through 70, as required by § 12.05C, he implicitly credited consultative examiner, Dr. Valette's test score, and discounted the hearing testimony of non-examining medical expert Dr. Layton's indicating he would "go with the Regional Center" test scores and that the score of 80 from Dr. Valette's testing was an "outlier".  The effect of discounting Dr. Layton's comments was to essentially validate the full-scale IQ score of 80 from consultative examiner Dr. Valette while invalidating the full-scale IQ score of 60 from the examiner at the San Diego Regional Center, Dr. Netter.  Nevertheless, it was permissible for the ALJ to make that determination because the ALJ has the "sole province" to resolve conflicts between conflicting medical evidence. *See Matney v. Sullivan*, 981 F.2d at 1019 ("[t]he trier of fact and not the reviewing court must resolve conflicts in the evidence, and if the evidence can support either outcome, the court may not substitute its judgment for that of the ALJ.") (citation omitted); *see also Allen v. Heckler*, 749 F.2d 577 at 579–80 (if the evidence supports more than one rational interpretation, the reviewing court must uphold the ALJ's decision and not second-guess the ALJ's choice among conflicting opinions).

1    Based on the opinions of an examining and non-examining physician, the ALJ determined

2  Plaintiff's other IQ scores between 60 and 70 were also invalid and inconsistent with her demonstrated

3  intellectual function. (AR 31)  In *Thresher v. Astrue*, the Ninth Circuit has stated: "[w]e do not doubt

4  that an ALJ can decide that an IQ score is invalid.  The regulations' inclusion of the word 'valid' in

5  Listing 12.05C makes the ALJ's authority clear."  *See Thresher v. Astrue*, 283 Fed. App'x 473, 475 (9th

6  Cir. 2008) (citable for its persuasive value pursuant to Ninth Circuit Rule 36-3).   The *Thresher* court

7  noted that while the Ninth Circuit has "never decided what information is appropriately looked to in

8  deciding validity... [o]ther courts have been more explicit and have indicated that in questioning a score

9  the ALJ must find some empirical link between the evidence and the score."  *Id.* at fn.6; *see also Wedge*

10 *v. Astrue*, 624 F.Supp.2d 1127, 1131-35 (C.D.Cal. 2008) (summarizing considerations from out-of-

11 circuit cases, such as whether the evidence shows a high possibility of malingering, daily activities

12 inconsistent with the IQ scores, inconsistencies between test results, and conflicting medical opinions).

13 Here, the ALJ provided specific, legitimate reasons such as variable test results and conflicting medical

14 opinions regarding the accuracy of Plaintiff's IQ scores to support his decision. *See Widmark v.*

15 *Barnhart*, 454 F.3d 1063, 1066 (9th Cir.2006).  Accordingly, **IT IS RECOMMENDED** the Court find

16 the ALJ properly set forth reasons, supported by substantial evidence in the record, to find Plaintiff's

17 low IQ scores within the 60 to 70 range were invalid.

18          **B.     The ALJ Properly Found Plaintiff's Learning Disability Was Not An Additional**

19                   **Impairment As Required By Listing §12.05C**

20          Listing 12.05C also requires an individual with an IQ score of 60 through 70 to have a physical

21 or other mental impairment imposing an additional and significant work-related limitation of function.

22 20 C.F.R. Pt. 404, Subpart P, Appendix 1, Listing § 12.05C.  A claimant's severe physical or other

23 mental impairment must be an impairment that is *apart* from his or her decreased intellectual function.

24 *Lawson v. Astrue*, 2010 WL 961722 (E.D. Cal. Mar. 16, 2010) citing *Fanning v. Bowen*, 827 F.2d 631,

25 633 (9th Cir. 1987); *see also Hinkle v. Apfel*, 132 F.3d 1349, 1352 (10th Cir. 1997); *Edwards v. Heckler*,

26 736 F.2d 625, 629–31 (11th Cir. 1984); *Nieves v. Secretary of Health & Human Servs.*, 775 F.2d 12, 14

27 & n. 7 (1st Cir. 1985).  As Plaintiff notes, individuals become disabled under the Commissioner's

28 regulations at step three because they develop the additional burden of dealing with a physical or other

1    mental impairment on top of sub-average intelligence. (Doc. No. 15-1 at 17.)  Plaintiff argues that she

2    has met the additional impairment prong of section 12.05C because the ALJ explicitly found her

3    learning disorder to be a severe impairment in the "Findings of Fact and Conclusions of Law" section of

4    his written decision. (AR 29.)

5           The Court has reviewed the ALJ's decision and notes that the decision does state: (1) "[t]he

6    claimant has the following severe impairment: learning disability"; and (2) "[t]he claimant's impairment

7    significantly limits her ability to perform basic work activities" in the Findings of Fact section. (AR 29.)

8    However, the decision later states: "even if the Claimant's IQ scores were reliable indications of the

9    Claimant's intellectual functioning, she does <u>not</u> have another severe impairment such that the

10   requirements of Medical Listing § 12.05C would be met." (AR 31.)  This latter conclusion contradicts

11   the ALJ's earlier finding and there is additional analysis inconsistent with the ALJ's finding of a severe,

12   limiting impairment at pages 8 and 9 of his written decision where he states: "[d]espite the claimant's

13   specific academic difficulties, the claimant's longitudinal education records reflect overall growth,

14   supporting the finding herein that the claimants learning disorder was not disabling"; and "[t]he

15   claimant's activities of daily living and volunteer work further supports the finding herein that the

16   claimant's learning disorder was not disabling."  (AR 34-35.)  This contradiction, however, is a

17   distinction without a difference if Plaintiff's learning disability is not a condition that is separate and

18   apart from Plaintiff's mental impairment as required under the additional impairment prong of section

19   12.05C.

20          To determine whether plaintiff's learning disability meets the listing "the Court must look to

21   testimony to decide whether it is medically considered a separate disability from mental retardation."

22   *See Michael v. Apfel*, 2000 WL 10006534, *5 (N.D. Cal. 2000).   Here, consultative examiner, Dr.

23   Valette, diagnosed Plaintiff as "intellectually functioning in the average range.  It is highly likely that

24   her memory is functioning minimally in the low average range.  Learning Disorder, NOS [Not

25   Otherwise Specified]".  (AR 460.) Similarly, examiner Dr. Netter of the San Diego Regional Center did

26   not identify Plaintiff's learning disorder as a separate disability by opining, "Cristina meets criteria for

27   mild mental retardation in that her Full Scale IQ is in the extremely low range and she demonstrates

28   deficits in adaptive functioning.  Her documented learning difficulties throughout her school years, and

23

current participation in a transitional program following completion of high school are also consistent with such a diagnosis."  (AR 520.)   Accordingly, the examining physicians' diagnoses support the ALJ's conclusion that Plaintiff's learning disorder is not an additional impairment that exists apart from her low mental functioning.  Moreover, it is worth noting that courts have found some learning disorders do not qualify as an "additional impairment" because the disorder is merely a symptom or manifestation of mental retardation.  *See Buckner v. Apfel*, 213 F.3d 1006, 1012 (8th Cir. 2000) (the court found Plaintiff's assertion that her learning disability, lack of good judgment, and difficulty concentrating and reasoning were merely symptoms or manifestations of her mental retardation and thus could not satisfy her obligation to show an additional impairment that meets the second part of § 12.05C; *see also Lyons v. Comm'r of Soc. Sec.*, 2008 WL 4057858 (W.D. Mich. Aug. 28, 2008) citing American Psychological Ass'n, Diagnostic and Statistical Manual of Mental Disorders (4th ed. Text Revision 2000) ("DSM-IV-TR") at 41-43 (showing that borderline intellectual functioning and mental retardation are mutually exclusive diagnoses at different points along the same spectrum).  Accordingly, **IT IS RECOMMENDED** the Court find the ALJ properly set forth reasons, supported by substantial evidence in the record, to find Plaintiff does not have an additional impairment as required by Listing § 12.05C.

## C.   The ALJ's Determination of Plaintiff's Residual Functional Capacity Is Supported by Substantial Evidence

The ALJ determines a claimant's Residual Functional Capacity ("RFC") at step four of the sequential evaluation process. 20 C.F.R. § 404.1545. In determining a claimant's RFC, the ALJ considers "all the relevant evidence in [the] case record." 20 C.F.R. § 404.1545(a)(1). This includes all of a claimant's "medically determinable impairments of which [the ALJ is] aware, including [the claimant's] medically determinable impairments that are not 'severe.'" 20 C.F.R. § 404.1545(a)(2). In addition, the ALJ considers "descriptions and observations of [the claimant's] limitations from [his or her] impairment(s), including limitations that result from [the claimant's] symptoms, such as pain, provided by [claimant]." 20 C.F.R. § 404.1545(a)(3).  As such, "an RFC that fails to take into

account a claimant's limitations is defective." *Valentine v. Comm'r of Soc. Sec. Admin.*, 574 F.3d 685, 690 (9th Cir. 2009).

Here, the ALJ found Plaintiff has the RFC to perform a full range of work at all exertional levels but with the following nonexertional limitations: simple, repetitive tasks, in a non-public work environment, with minimal interaction with co-workers and supervisors. (AR 33.) The ALJ based this finding on Plaintiff's school records reflecting improvement, a variety of daily work activities and social interaction, and positive reports regarding the Plaintiff's volunteer work reflected in the Administrative Record. (AR 37.)

**1. The ALJ Considered All Relevant Evidence In The Record**

Plaintiff argues the ALJ erred in his formation of Plaintiff's RFC by picking and choosing from opinions in the record to craft an RFC he preferred and therefore failed to consider the entire opinions of Plaintiff's teacher, Ms. Weckerly, clinical psychologist Dr. Netter, Medical Expert Dr. Layton, the State Agency review physician Dr. Amado, and the Vocational Expert Dr. Lasoff. (Doc. No. 15-1.)  There is no indication in the record, however, that the ALJ gave weight to *only* portions of the above opinions. To the contrary, the ALJ explained the reasoning behind the consideration and weight he gave to each opinion in the record as described below.

As to Plaintiff's teacher, Ms. Weckerly, Plaintiff argues the ALJ failed to consider Ms. Weckerly's opinion that Plaintiff had difficulties maintaining pace. In the ALJ's decision, however, he acknowledges that Ms. Weckerly indicated Plaintiff had mostly no problem or only slight problems in the area of attending and completing tasks and Plaintiff's pace depended on the complexity of the task. (AR 36.) The ALJ also considered Ms. Weckerly's opinion that once Plaintiff learned a skill and successfully repeated it, she maintained the skill. (AR 30, 565-573.) The ALJ concluded, from this questionnaire, that Ms. Weckerly's overall assessment is consistent with the finding that Plaintiff has the capacity to perform simple, repetitive tasks. (AR 36.) The ALJ gave Ms. Weckerly's report significant weight because Dr. Layton indicated at the hearing that he placed great emphasis on teacher reports. (*Id.*)

As to Dr. Netter's opinion, Plaintiff contends the ALJ failed to accept the portion of Dr. Netter's opinion that indicated Plaintiff would continue to require much guidance and assistance to operate independently. (Doc. No. 15-1 at 19.) However, Dr. Netter actually indicated in his opinion that Plaintiff would likely require much guidance and assistance in order to "live independently", not operate independently. (AR 36.) Moreover, the ALJ explained that to the extent Dr. Netter's report did not contain a specific functional assessment, it could not be assigned much weight. (*Id*.) *See Qantu v. Barnhart*, 72 F. App'x 807 (10th Cir. 2003) (The fact that [the] consulting psychologist did not provide any functional assessment of claimant's abilities was a legitimate basis for rejecting [that] source's opinion.)

As to Dr. Layton's opinion, Plaintiff contends the ALJ failed to consider Dr. Layton's opinion that Plaintiff has "moderate limitations in concentration, persistence, and pace", which Dr. Layton defined as "requiring some assistance available to complete even simple tasks." (Doc. No. 15-1 at 19.) However, the ALJ did consider Dr. Layton's testimony that Plaintiff had difficulty with the learning process itself and it would take Plaintiff longer to learn tasks. (AR 35.) The ALJ gave more weight to Dr. Layton's *overall* conclusion that Plaintiff could perform simple, repetitive tasks in a work environment, and would have generally mild limitations in interacting with the public, coworkers, or supervisors. (*Id*.) Specifically, the ALJ indicated that because Dr. Layton's assessment was supported by and consistent with the record, he gave it significant weight. (AR 36.)

As to the State Agency review physician, Dr. Amado, Plaintiff argues the ALJ failed to consider Dr. Amado's assessment that Plaintiff had moderate limitations in "completing a normal workday and/or work week and to perform at a consistent pace without an unreasonable number and length of rest periods due to psychological impairments." (Doc. No. 15-1 at 19.) The administrative record reflects Dr. Amado did check the "moderate" box in response to a questionnaire asking Dr. Amado to rate Plaintiff's limitations in completing a workday. (AR 474.) However, the ALJ also considered Dr. Amado's opinion at the end of that questionnaire that concluded Plaintiff "was not precluded from performing entry-level unskilled work activity." (AR 36.) State agency consultants N. Haroun, M.D. and K. Whal affirmed this assessment. (*Id*.) The ALJ gave these three assessments greater weight because they were consistent

26

with Plaintiff's school and transition records reflecting improvement and positive reports of her

volunteer work activities. (AR 36-37.)

### 2. The ALJ Properly Discredited Plaintiff's Attorney's Hypothetical As Unsupported By the Record

At step five of the disability analysis, the Commissioner may meet his burden of demonstrating

the claimant is not disabled and that she can engage in some type of substantial gainful activity that

exists in "significant numbers" in the national economy, by propounding to a vocational expert, a

hypothetical that is based on medical assumptions supported by substantial evidence in the record that

reflects all the claimant's limitations. *See Roberts v. Shalala*, 66 F.3d 179, 184 (9th Cir. 1995);

*Mahallanes v. Bowen*, 881 F.2d 747, 756 (9th Cir. 1989). During the hearing the Commissioner met this

burden when the ALJ asked the Vocational Expert:

> "Assuming that we have a younger individual with a high school education obtained through
> special [education] and no past relevant work activity. If there were no physical limitations and
> there were limitations to simple repetitive tasks, and I'll say nonpublic work environment, and
> minimal interaction with coworkers and supervisors, would there be work activity that exists
> either nationally or locally that could be performed?"

(AR 67.)

The Vocational Expert responded: "yes, one example would be a laundry laborer and another would be

a garment folder." (*Id.*) The Vocational Expert also stated these positions assume the capability of

sustaining 40 hours of work activity [per week]. (*Id.*)  Plaintiff contends that during the ALJ's

determination of Plaintiff's RFC, he improperly discredited a different hypothetical question posed by

Plaintiff's attorney to Vocational Expert, Dr. Lasoff.  Specifically, Plaintiff's counsel asked the

Vocational Expert:

> "[T]he same individual, as already cited, but with moderate limitations on persistence and pace,
> and moderate limitations on ability to complete a normal workweek…off task at least, I'm
> guessing, 20 percent of the time. Would that individual be able to complete those jobs that you
> just described?"

(AR 67-68.)

In response to Plaintiff's attorney's hypothetical question, the Vocational Expert responded that the individual under the modified hypothetical could not sustain full-time employment. (AR 68.)  As a result, Plaintiff argues that while an individual must have the residual functional capacity to "sustain" employment (i..e a work schedule of "8 hours a day, for 5 days a week, or an equivalent"), the RFC crafted by the ALJ ignores Plaintiff's attorney's hypothetical and improperly fails to take into account a work schedule limitation.  Plaintiff's argument, however, is based on a response to a modified hypothetical question which was posed by her own attorney, not the ALJ.  An ALJ is free to accept or reject restrictions in a claimant's hypothetical question if they are not supported by substantial evidence. *See Osenbrock v. Apfel*, 240 F.3d 1157, 1164-65 (9th Cir. 2001) (holding the ALJ was not bound to accept as true the restrictions set forth in the second hypothetical question where they were not supported by substantial evidence.); *see also Jones v. Barnhart*, 364 F.3d 501 (3d Cir. 2004) (The ALJ did not err in failing to accept Claimant's hypothetical where the hypothetical posed to the VE was inconsistent with the evidence in the record.)

Here, the ALJ did not credit the VE's response to Plaintiff's attorney's hypothetical question because the hypothetical included information that was contradictory to medical reports and the ALJ's findings.  Specifically, Plaintiff's attorney's hypothetical included "moderate limitation[s] on [Plaintiff's] ability to complete a normal workweek" based on Dr. Amado checking the "moderate" box in response to a questionnaire asking him to rate Plaintiff's limitations in completing a workday. (AR 67; 474.)  However, as stated above, the record shows that the ALJ gave more weight to the *conclusion* of Dr. Amado's report, that Plaintiff was not precluded from performing entry-level unskilled work activity.  Dr. Amado's report did not contain an opinion that Plaintiff was unable to complete a normal workweek. (AR 36.)

Plaintiff's attorney's hypothetical also posited "moderate limitations on persistence and pace", seemingly based on Dr. Layton's assessment that Plaintiff had moderate difficulties in concentration, persistence, or pace for simple, repetitive tasks. (AR 32.) However, the ALJ accommodated Plaintiff's difficulties in this area by limiting her to simple, repetitive tasks in his hypothetical question to the Vocational Expert. (AR 33; 67.)

Because the record does not support Plaintiff's hypothetical, the Vocational Expert's opinion that Plaintiff cannot sustain full-time employment is also not supported by the record. If a hypothetical "does not reflect all the functional limitations, the expert's testimony…has no evidentiary value." *DeLorme v. Sullivan*, 924 F.2d 841, 850 (9th Cir. 1991). Therefore, the ALJ did not need to consider it in his analysis of Plaintiff's RFC.

Moreover, as addressed above, the ALJ considered all relevant evidence in the case record to make his RFC determination. In addition to opinion evidence, the ALJ considered Plaintiff's testimony that she had trouble with complex tasks, such as measuring, and accommodated those issues by limiting her to simple, repetitive tasks. (AR 34.) The ALJ also considered Plaintiff's school records that indicate delays in cognitive and adaptive areas, as well as her longitudinal education records that reflect overall growth, which support a finding that Plaintiff's learning disorder was not disabling. (AR 34, 297-354.) Additionally, the ALJ considered Plaintiff's daily living activities and volunteer work that further support the finding that Plaintiff's learning disorder was not disabling. Plaintiff volunteered at three different locations and received positive reports about her performance. (AR 35, 302.) Plaintiff also reported a variety of daily activities, including preparing herself simple breakfast food, riding public transportation to work sides, and helping with household cleaning. (AR 35, 258-270.)

After review of the record, **IT IS RECOMMENDED** the Court find the ALJ's determination of Plaintiff's Residual Functional Capacity is supported by substantial evidence and free of legal error.

## VI.  CONCLUSION

Having reviewed the matter, the undersigned Magistrate Judge recommends that Plaintiff's motion for summary judgment be **DENIED** and that Defendant's cross-motion for summary judgment be **GRANTED**.  This Report and Recommendation of the undersigned Magistrate Judge is submitted to the United States District Judge assigned to this case, pursuant to 28 U.S.C. § 636(b)(1).

**IT IS ORDERED** that no later than **June 3, 2014**, any party to this action may file written objections with the Court and serve a copy to all parties.  The document should be captioned "Objections to Report and Recommendation."

*///*

1    **IT IS FURTHER ORDERED** that any reply to the objections shall be filed with the Court and

2    served on all parties no later than **June 17, 2014.**

3    DATED:  May 20, 2014

4

5

6    Hon. Bernard G. Skomal

     U.S. Magistrate Judge

7    United States District Court

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

30